

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-14-608

| | | |
|---|---|---|
| | | **Opinion Delivered** February 18, 2015 |
| JONAS W. STARR | | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT |
| | APPELLANT | [No. DR 2013-1820-6] |
| V. | | HONORABLE MARK LINDSAY, JUDGE |
| LISA K. STARR | | |
| | APPELLEE | AFFIRMED |

## LARRY D. VAUGHT, Judge

Appellant Jonas Starr appeals from the divorce decree entered by the Circuit Court of Washington County, awarding appellee Lisa Starr custody of the parties' minor child, S.S. Jonas argues that the trial court clearly erred in finding that it was in S.S.'s best interest to be placed in Lisa's custody. He also argues that the trial court clearly erred in separating S.S. from her three half-sisters. We affirm.

Jonas and Lisa were married September 22, 2010. Prior to their marriage, their daughter, S.S., was born.[1] Jonas also had custody of his three daughters (B.S., age fourteen; C.S., age thirteen; and T.S., age twelve) from a previous marriage. Jonas and Lisa separated in August 2013, at which time Lisa and S.S. moved out of the marital home. On September 19, 2013, Jonas filed a complaint for divorce based on general indignities and requested custody of S.S. Lisa filed

---

[1]S.S. was born September 26, 2004. Jonas signed an acknowledgment of paternity, and his name is on her birth certificate. Each party acknowledged that Jonas is the father of S.S.

an answer and counterclaim for divorce based on general indignities and requested custody of S.S.

At trial, Jonas testified that he had been employed with Superior Industries for fourteen and a half years. He testified that he filed for divorce because Lisa regularly drank alcohol to the point of intoxication, which resulted in verbal and physical abuse toward the children. He said that she often had accidents and falls when she was intoxicated. He testified that since their separation, the atmosphere in his home had improved. He said that it was calm, structured, and clean. He said that his four daughters got along very well and treated each other as full siblings. He denied physically abusing Lisa.

Jonas further testified that he divorced Laura May Ellen Presley, the mother of B.S., C.S., and T.S., in 2003. He said that B.S., C.S., and T.S. did not see their mother for a few years after the divorce. He stated that when Laura was not paying child support, he did not encourage or discourage the relationship between his older daughters and their mother.

Kris Pennington, one of Jonas's best friends, testified that Lisa's heavy drinking was a big problem. He said that when she drank, she was verbally abusive to the children. He added that the four girls were "a real tight group" and that Jonas was more nurturing to the children than Lisa. Robert Johnson, Jonas's friend for more than fourteen years, testified that Jonas got along very well with all four girls and that the older girls got along well with S.S. Robert added that he saw Lisa drinking alcohol daily, often to intoxication, and that she yelled at the girls when she was drinking.



T.S. testified that her father was her primary caregiver. She said that she shared a room with S.S., that she and S.S. spent a lot of time together, and that she considered her relationship with S.S. no different than her relationship with her other sisters. T.S. testified that Lisa drank "a lot, like everyday" and that when she drank too much, she was mean, cranky, and yelled at the girls. T.S. also said that Lisa slapped her. However, she added that she called Lisa, "Momma," and that since the separation she had not been able to spend the night with Lisa but wanted to.

Lisa testified that she had been working at the Salvation Army Family Store the last eight and a half years. She too had children from a prior relationship, Samantha (twenty-four years old) and Bruce (almost twenty). When they were young, Lisa and her kids moved in with her parents after she lost her job. When Lisa found employment in another town, she consented to her parents' adoption of her older kids. Thereafter, Lisa met Jonas and began caring for his three daughters.

Lisa testified that she and S.S. were very close. She said that when she moved out of the marital home, it was natural for her to take S.S. with her and that Jonas did not object. The home that Lisa and S.S. moved into was not in the girls' school district. However, Lisa drove S.S. to Jonas's house every school morning so that S.S. could ride the bus with T.S. Then Lisa picked S.S. up at Jonas's house after work around 5:00 p.m. Lisa testified that S.S. was making As and Bs in school and had no behavioral issues. Lisa said that she attended S.S.'s last parent conference, while Jonas did not. After the divorce, Lisa stated that she planned to move to

another house in the same school district because S.S. was comfortable there, knew the school and teachers, had good friends there, and was doing very well.

Lisa said that she encouraged S.S. to have a good relationship with her father and that she had spent the night with Jonas four or five times in the past six months. Lisa said that Jonas let B.S. spend the night with her (Lisa) only one time since the separation. According to Lisa, S.S. asked Jonas if her sisters could spend the night, but Jonas said no.

Lisa also testified that Jonas was abusive, physically and verbally, to her and his daughters. She said that he struck her in the face three years ago, giving her a black eye. On other occasions, he hit her, gave her black eyes, knocked and pushed her down, choked her, put her in a "sleeper hold," knocked her out, and bruised her arms. She said she had scars on her face and knee from the abuse. Lisa admitted drinking alcohol, sometimes to excess; however, she denied drinking to the extent described by Jonas, Kris, and Robert and denied that it was a problem. She also denied making statements on her Facebook page about her need to drink.

Glenda Nunn, the manager and Lisa's supervisor at the Salvation Army Family Store, testified that Lisa's work was excellent. Glenda said that she had never seen Lisa come to work late or under the influence of alcohol and that she never smelled alcohol on Lisa. Glenda stated that Lisa was a loving, caring mother. Glenda added that she believed that Lisa was physically abused by Jonas (she saw Lisa with a black eye and bruised arms) and that Lisa confided in her about the abuse. She also saw Jonas come to Lisa's work very angry and order her home.

Donna Garret, Lisa's co-worker, testified that she did not notice Lisa having any problems at work caused by drinking alcohol. Donna said that Lisa was a great mother to all four

girls. Donna added that she had no problem leaving her three daughters, aged thirteen to three, with Lisa. Donna also told the trial court that Jonas was verbally abusive and demeaning to Lisa. Donna said that Lisa, who came to work with bruises on her face and arms, told Donna that Jonas abused her.

Lori Johnson, a long-time friend of Lisa's, testified that she had seen Jonas drink alcohol, yell, scream, and punch holes in a wall. Lori also witnessed Jonas physically abusing Lisa. She saw Lisa with black eyes, and she said that Lisa told her Jonas hit her. Lori added that Lisa was a very attentive mother and that she did not have a drinking problem anymore.

Lisa's mother, Linda Larson, testified that she adopted Lisa's older children after Lisa lost her job and had to move out of town to find work. Lisa consented to the adoption so that her parents could make legal decisions for the children. While in Fayetteville, Lisa met Jonas and began caring for his children. Linda testified that Lisa continued to have contact with her older children. Samantha Raley, Lisa's oldest child, testified that she had maintained contact with her mother despite the adoption. Samantha testified that Lisa's relationship with S.S. was great and that she (Samantha) had no reservations leaving her two children with Lisa.

At the conclusion of the trial, the court granted Jonas's complaint for divorce based on general indignities and dismissed Lisa's counterclaim. The trial court further found that it was in the best interest of S.S. to be in Lisa's custody. In support of its award, the trial court found that Lisa's coworkers testified that she had no problems at work due to alcohol; S.S.'s grades were good; Lisa was participating in S.S.'s school activities, including the most recent parent-teacher conference, which Jonas did not attend; Jonas did not consider S.S.'s living with Lisa a

threat because he did not object or request an emergency hearing when the parties separated; nothing negative had happened while S.S. was in Lisa's custody; S.S. had contact with her half-siblings as she spent time with them during school and after school; T.S. testified she wanted to spend the night with Lisa, which demonstrated that she was not afraid of her; and Lisa demonstrated that she would not frustrate S.S.'s relationship with her father or her sisters. The trial court also found that S.S. was going to have ample opportunity to spend time with her sisters. The trial court subsequently entered a divorce decree finding that Lisa was the fit and proper person to have primary care, custody, and control of S.S. subject to reasonable visitation by Jonas. This appeal followed.

Our standard of review in child-custody cases is well established. We consider the evidence de novo but will not reverse unless the trial court's findings are clearly erroneous or clearly against the preponderance of the evidence. *Delgado v. Delgado*, 2012 Ark. App. 100, at 4, 389 S.W.3d 52, 56. Findings are clearly against the preponderance of the evidence when we are left with an irrefutable and express belief that a mistake has occurred. *Id.*, 389 S.W.3d at 56. We give due deference to the superior position of the trial court to view and judge the credibility of the witnesses. *Id.*, 389 S.W.3d at 56. This deference to the trial court is even greater in cases involving child custody, as a heavier burden is placed on the trial court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the child. *Id.*, 389 S.W.3d at 56. Child-custody cases are unique because there are no other cases in which the superior position of the trial court to assess witness credibility carries as much

 

weight. *Id.*, 389 S.W.3d at 56. The primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. *Id.*, 389 S.W.3d at 56.

Arkansas law is well settled that the primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. *Evans v. McKinney*, 2014 Ark. App. 440, at 4, 440 S.W.3d 357, 359 (citing *Anderson v. Thomas*, 2013 Ark. App. 653). *See also* Ark. Code Ann. § 9-13-101 (Supp. 2013). Jonas first contends that the trial court clearly erred in finding that it was in S.S.'s best interest to be placed in Lisa's custody. He lists all of the unfavorable evidence elicited about Lisa at trial—focusing primarily on her drinking problem—and contends that she cannot provide a wholesome environment for S.S.; therefore, it is not in her best interest to be in Lisa's custody. He also contends that the findings made by the trial court in support of its custody decision "are not nearly as significant as the evidence" he presented.

Lisa argues that Jonas's argument on appeal concerns only questions of fact and witness credibility, which fall within the trial court's province. *Delgado*, 2012 Ark. App. 100, at 4, 389 S.W.3d at 56. She points out that the trial court was faced with "plenty of unimpressive testimony about both parties drinking, fighting, yelling, and screaming at one another. Jonas and his witnesses blamed Lisa for the dysfunction, while Lisa and her witnesses blamed Jonas for the problems at home." After weighing the evidence in her favor, Lisa argues that the trial court correctly determined that it was in S.S.'s best interest that Lisa be granted custody.

We agree with Lisa. The trial court heard all of the conflicting evidence, it determined the credibility of the witnesses, it weighed the evidence, and found in favor of Lisa. There is



evidence supporting the award of custody to her. There was testimony that S.S. was doing well in Lisa's care since the separation. She was doing well in school, and Lisa was attending S.S.'s school events. There was evidence that Lisa would not frustrate the relationships between S.S. and her father (and her half-sisters), which is also a consideration in the best-interest analysis. Ark. Code Ann. § 9-13-101(b)(1)(A)(i), (2) (Supp. 2013). Lisa made the effort every school day to drop off and pick up S.S. at Jonas's home so that she could ride the bus to and from school with T.S. Lisa permitted S.S. to spend the night with Jonas and the girls four to five times during the separation. Lisa offered to have S.S.'s half-sisters spend the night with S.S. In contrast, there was evidence that when S.S. asked Jonas if her sisters could spend the night at Lisa's, Jonas said no. There was also evidence that for years Jonas did not encourage contact between B.S., C.S., and T.S. and their biological mother.

Finally, while Jonas tried to convince the trial court that Lisa's drinking was a threat to S.S., the trial court questioned his testimony, noting that he did not object to Lisa's custody of S.S. upon the parties' separation and that T.S. wanted to spend the night with Lisa. Co-workers of Lisa's testified that alcohol had no effect on her work and that she was a loving mother. Several witnesses testified that they would allow and had allowed Lisa to care for their young children. Based on our de novo review of the record, we cannot say that the trial court clearly erred in finding that it would be in the best interest of S.S. to be placed in Lisa's custody.

Jonas's second point on appeal is that the trial court's decision to award custody of S.S. to Lisa was clear error because it separated S.S. from her three half-siblings. He cites to

testimony from several witnesses who described the relationship between S.S. and her half-sisters as healthy, strong, and loving.

This court has recognized that "unless exceptional circumstances are involved, young children should not be separated from each other by dividing their custody." *Sykes v. Warren*, 99 Ark. App. 210, 217, 258 S.W.3d 788, 793 (2007). Our court has been critical of parties who use this rule as a substitute for a determination of what is in a child's best interest. *Atkinson v. Atkinson*, 72 Ark. App. 15, 20, 32 S.W.3d 41, 44 (2000). The primary consideration in child-custody cases is the welfare and best interest of the child involved. *Donato v. Walker*, 2010 Ark. App. 566, at 8, 377 S.W.3d 437, 441. All other considerations are secondary. *Id.*, 377 S.W.3d at 441. While one factor the court must consider in determining the best interest of the child is whether the child will be separated from her siblings, the polestar consideration in every child-custody case is the welfare of the individual child. *Id.*, 377 S.W.3d at 442.

We are mindful that the trial court's custody decision has the effect of separating S.S. from her three half-sisters. However, we have held that the prohibition against separating siblings in the absence of exceptional circumstances does not apply with equal force in cases where the children are half-siblings. *Id.*, 377 S.W.3d at 442. In this case, Lisa expressed her desire that the girls spend time together. Her actions confirmed this. Due to her efforts, S.S. and her half-sisters will spend time together before and after school. S.S. will attend the same school as T.S., and they will ride the bus to and from school together. Lisa was amenable to having the girls spend the night together at her house and at Jonas's house. And anytime Jonas has visitation with S.S., his older daughters will be there. Therefore, we hold that the trial court did not clearly

SLIP OPINION

err in separating S.S. from her half-siblings. *White v. White*, 2014 Ark. App. 594, at 9, 446 S.W.3d 636, 639 (affirming the trial court's custody decision, which was based on the best interest of the child, despite the resulting separation of the child from his half-brother); *Donato*, 2010 Ark. App. 566, at 8, 377 S.W.3d at 442 (affirming the trial court's custody decision, which was based on best interest of the child, despite the resulting separation of the child from her half-sister). Accordingly, we affirm.

Affirmed.

HARRISON and WHITEAKER, JJ., agree.

*Penix & Taylor, PLLC*, by: *Stephen Taylor*, for appellant.

*Campbell & Cuzick, PLLC*, by: *Greg R. Cuzick*, for appellee.